IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICK J. DOUGHERTY | : | |
| 352 Marvin Road | : | |
| Shickshinny, Pa 18655 | : | |
| | : | |
| DEREK D. FELSMAN | : | |
| 202 Hampshire Dr. | : | |
| Jefferson Township, Pa 18436 | : | |
| | : | |
| Plaintiffs, | : | : |
| v. | : | |
| | : | |
| GOVERNOR JOSH SHAPIRO, | : | |
| | : | |
| THE COMMONWEALTH OF | : | |
| PENNSYLVANIA, | : | |
| | : | |
| | : | |
| STATE POLICE MAJOR  NORMAN | : | |
| CRAMER | : | |
| | : | |
| STATE POLICE LIEUTENANT | : | |
| COLONEL GEORGE BIVENS | : | COMPLAINT IN CIVIL ACTION |
| | : | |
| | : | |
| JOHN & JANE DOES #1-#10, | : | |
| | : | |
| | : | |
| c/o Governor Josh Shapiro | : | |
| 501 North Third Street | : | |
| 508 Main Capitol Building | : | JURY TRIAL DEMANDED |
| Harrisburg, PA 17120 | : | |
| Defendants | : | |

:
## COMPLAINT – CIVIL ACTION

COMES NOW, PATRICK J. DOUGHERTY and DEREK D. FELSMAN  (together

"Plaintiffs" or individually "Dougherty" or "Felsman) through their lawyer, Mark D. Schwartz,

Esquire who represent as follows:

## INTRODUCTION- SUMMARY OF CLAIMS

1      First, this action arises as a result of The Commonwealth of Pennsylvania's (the "Commonwealth") and the other named defendants acting under color of law in retaliating against Plaintiffs as a result of their exercising speech protected under the First Amendment as well as other amendments and 42 USC Section 1983, which provides for a civil action against persons named in their individual capacities for depriving them of protected rights including the right of free speech, free association, due process and equal protection.  Furthermore, case law found at *Ex Parte Young*, 209 U.S. 123 (1908) provides for seeking prospective relief against a state official in his or her official capacity.  In this case Governor Shapiro, ultimately responsible as the chief executive of the Commonwealth, for upholding the law and the proper administration of Commonwealth departments and employees, is sought to be enjoined from allowing the ongoing violations of state and federal constitutional law that Plaintiffs allege has and continues to take place by and within his administration.

2.      Second, this action also arises from  Plaintiffs' reports to superiors and others of waste and wrongdoing, including fraud when it came to Plaintiffs bona fide complaints of felonious acts by others in the Pennsylvania State Police Department when it came to falsifying shift times. This reporting, instead of being positively heralded ,ultimately resulted in unlawful retaliation against them by the Commonwealth and other named defendants. Retaliation   has included stripping them of responsibilities, demoting them and depriving them of opportunities for professional development.  Accordingly, Plaintiffs bring this action pursuant to the Pennsylvania Whistleblower Law, which was specifically enacted by the Commonwealth of Pennsylvania to prohibit precisely the kind of unlawful and retaliatory employer conduct and actions that the Commonwealth has taken and continues to against Plaintiffs.

2

<u>THE PARTIES</u>

3.      Plaintiff PATRICK J. DOUGHERTY is an adult male who resides at 352 Marvin Road, Shickshinny, PA 18655. He has been employed by the Commonwealth's State Police and is currently a State Police Captain, having served since enlisting on October 25, 2004.

4.      Plaintiff DEREK D. FELSMAN is an adult male who resides at 202 Hampshire Drive, Jefferson Township, Pa 18436. He has been employed by the Commonwealth's State Police and is currently a State Police Lieutenant having served since enlisting on January 22, 2007.

5.      Others, including but not limited to Defendants State Police Major NORMAN CRAMER and Lieutenant Colonel GEORGE BIVENS in their individual capacities, together with various JOHN and JANE DOEs, in various capacities, are legally liable to Plaintiffs given their deliberate failure to exercise their affirmative governmental responsibilities to follow and carry out the  laws and regulations about theft, thereby violating those laws, regulations, and the applicable Collective Bargaining Agreement  and illegally retaliating against Plaintiffs

6.      Defendant THE COMMONWEALTH OF PENNSYLVANIA ("the Commonwealth" or "Defendant Commonwealth") is a state government entity, corporate and politic, which has been a member state of the union, known as the "United States of America" since ratifying the U.S. Constitution on December 12, 1787. At all times pertinent, it has been Plaintiffs' employer and is headquartered at 501 North Third Street, 508 Main Capitol Building, Harrisburg, PA 17120. At all times relevant hereto when it came to Plaintiffs, Defendant Commonwealth acted through its officers, agents, servants and employees who, cloaked with

governmental authority, were acting under color of law within the course and scope of their Commonwealth employment.

## FULFILLMENT OF CONDITIONS PRECEDENT

7.      Plaintiffs have fulfilled any and all conditions precedent to the institution of this action under Federal and State law having served pertinent officials, including but not limited to, Governor Shapiro, Attorney General Sunday, and General Counsel Selber and State Police Commissioner Paris, by certified mail on November 25, 2025, a "Notice of Intention to Commence Civil Action Against the Commonwealth of Pennsylvania and It Officials" pursuant to 42 Pa C.S. § 5522(a)(1).

## JURISDICTION & VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this is a civil action arising under federal law.

9.      Plaintiffs also invoke the supplemental jurisdiction of this Court over their related claims arising under state law pursuant to 28 U.S.C. §1367(a), all of which are so related to the federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) and (c), since both Plaintiffs and Defendants reside and do business in the Eastern District of Pennsylvania, and since the events giving rise to Plaintiffs' claims occurred in the Middle District of Pennsylvania.

## FACTUAL ASSERTIONS

11.    Plaintiff Patrick Dougherty is an adult male born July 30, 1973.  He earned an

Associate's Degree in Electronic Engineering from Luzerne County in 1994 and Bachelor's

Degree in Professional Studies from Misericordia University in 2017.  He is a graduate of

Northwestern University School of Police Staff and Command.  He enlisted in the Pennsylvania

State Police ("PSP") on October 25, 2004.  Upon graduation from the academy, Plaintiff

Dougherty was assigned to Troop R, Honesdale as a Patrol Trooper in May, 2005.  He would

later transfer to Troop P, Laporte.  In April 2008, he was assigned to the Criminal Investigation

Unit at Troop P, Shickshinny as a criminal investigator.  Plaintiff Dougherty would later be

promoted to the rank of Corporal in July, 2011, and was assigned to Troop R, Gibson as a Patrol

Unit Supervisor up until July 2012, where he later transferred to Troop R, Honesdale and took

over as the Criminal Investigation Supervisor.  In October 2012, he transferred to Troop P, and

was assigned to the Tunkhannock Station as a Patrol Unit Supervisor.  In January 2013, he

returned to the Shickshinny Station and took over as the Criminal Investigation Unit Supervisor.

Plaintiff Dougherty was promoted to Sergeant in December 2013, and assigned to Troop B,

Uniontown as the Patrol Unit Supervisor.  His primary responsibility was scheduling the

members of the patrol unit.  From May 2014 thru May 2017, he served as a Review Team

Member in the Bureau of Integrity and Professional Standards, Systems Process and Review

Division.  He would then go on to serve as the Station Commander at Troop P, Towanda from

May 2017 thru February 2018.  Subsequently, Plaintiff Dougherty was promoted to Lieutenant

February 2018, and remained in Troop P.  As Lieutenant, he served as the commander in all

three sections within the Troop, starting as the Staff Section Commander.  He later advanced to

the Patrol Section Commander and finishing up as the Criminal Investigation Section

Commander before being promoted to Captain in June 2021, ultimately remaining in Troop P, as the Troop Commanding Officer. His responsibilities included oversight and management for all Troop-wide functions, personnel and administrative responsibilities, which include five stations: Wilkes-Barre, Laporte, Shickshinny, Towanda, and Tunkhannock. As Troop Commander, he completed numerous Internal Affairs Division adjudications as assigned.  He served as the TOPCOM on numerous high-risk incidents and handled many serious police incidents that occurred within Troop P.  He built strong relationships with the multiple county District Attorneys, local law enforcement partners, and the citizens within the community they serve. Throughout Plaintiff Dougherty's career, he has consistently received high marks in all employee reviews.  While Plaintiff Dougherty continues to have the rank of Captain, he was abruptly removed on July 2, 2025, and immediately reassigned to the position of Assistant Director of Municipal Police Officers' Education and Training Commission located in Harrisburg, PA, a position that had not previously existed, all in retaliation for his investigating and reporting the falsification of time/shifts by others.

12.     Plaintiff Derek Felsman is an adult male born on August 12, 1985.  He graduated from Harrisburg Area Community College with an Associate's Degree in Fire Science in 2005. He subsequently received his B.A. in Public Safety from Holy Family University in Philadelphia, Pa.  He began his career with the State Police on January 22, 2007 where from August, 2007 through July, 2013 he served as a Patrol Trooper at Troop N, Swiftwater.  From July, 2013 to May, 2016 as a Corporal at Troop R, Honesdale, he  and served as Patrol Unit Supervisor.  There , during his assigned shift he maintained operational control  and developed a strong level of understanding and experience in operational and administrative functions at the Troop level. While a Corporal, he also volunteered as a Subject Matter Expert for the Department's

computerized records management system implementation. In addition, he expanded his experience, testifying as an impaired driving expert witness in northeastern Pennsylvania. From May, 2016 through March, 2021 Plaintiff Felsman had various operational assignments as a Sergeant that ended with a four-year stint as Station Commander for Troop P, Tunkhannock. During his entire time at the rank of Sergeant, he was responsible for scheduling of each Department segment he oversaw. Plaintiff Felsman consistently received high marks in all employee performance reviews and strong ratings during administrative inspections where he provided leadership and management. From March, 2021 through January 2024, promoted to Lieutenant, he acted as the Patrol Section Commander for Troop P, Wilkes-Barre. He was responsible for ensuring that all Troopers assigned to the Patrol Function followed regulations and policies. On multiple occasions, this also included service as Acting Troop Commander, overseeing Troopers assigned to Crash Reconstruction, Vehicle Fraud and Commercial Vehicle Inspections, managing patrol-related overtime and completing Internal Affairs Division adjudications as assigned. Plaintiff Felsman was known for his willingness to make Troop operational improvements when necessary and also provided feedback and thought through established Department channels for agency-wide improvement, leading to successful implementation of multiple suggestions. From January of 2024 through July, 2025, he served as the Criminal Investigation Section Commander in Troop P, where he was responsible for managing those assigned to the Criminal Investigation Section,. This section included the Criminal Investigation Unit, Forensic Services Unit, Criminal Investigation Assessment, Vice, Intelligence and Fire Marshals. Among the many homicides and other serious incidents he managed including a multi-state Drug Delivery Resulting in Death investigation and two officer-involved shootings. Throughout his years at the rank of Lieutenant, Plaintiff Felsman had been

7

routinely placed in charge of planning and executing complex and large Troop operations.  While Plaintiff Felsman continues to have the rank of Lieutenant, from July 8, 2025 through August, 2025 he has been retaliated against by removal from his Criminal Investigation Section Commander position and sidelined to the phony position of Special Projects Commander  (a made-up position, never previously designated in the Troop P manpower allocation table) Feeling coercion and the prospect of further retaliation, he then transferred to Troop R, Dunmore where he has served as Patrol Section Commander from August, 2025 until the present, all as a result of his investigating and reporting the falsification of time / shifts by others.  His removal and subsequent mistreatment are clearly  in retaliation for his investigating and reporting the falsification of time shifts by others.

13.     According to the PA.GOV website, "The Pennsylvania State Police formed, in 1905, becoming the first uniformed police organization of its kind in the U.S. We provide law enforcement and public safety services to residents and visitors to the Commonwealth and work alongside our local, state and federal partner agencies."  Presumably, law enforcement includes enforcing the law when it comes to actions of  members of the State Police.

14.     PSP Retaliation against Plaintiff Derek Felsman began in September of 2022 when a  group photograph involving the President of the United States that included Plaintiff Felsman  was released by the President. Although Plaintiff Dougherty was not in the photo, but for the action of then Governor Wolf, PSP supervisors of Dougherty were in the process of removing him from his position. This marked the beginning of retaliation against Plaintiffs.

15.      On February 11, 2025, Plaintiff Dougherty was in Lieutenant James Youngblood's office at Troop P, Wilkes-Barre when Lieutenant Youngblood informed him that he had been in the SAP System (PSP Scheduling System) and noticed that Sergeant Mark Hydock, a Criminal

Investigation Unit Section Supervisor, was scheduled for straight 1200-2000 shifts, which were at variance with the morning shifts that Hydock had been seen working.   Plaintiff Dougherty then returned to his office and examined  the SAP System himself to confirm this information.   He researched shifts from the then present date back to January 1, 2025.  The system showed that the schedule of Sergeant Hydock, reflected steady across the board 1200-2000 schedules, enabling him to collect an additional five percent (5%) shift differential in his pay for a shift that he neither was assigned, nor worked.  In point of fact, he primarily worked the 0700-1500 or 0800-1600 shifts where Hydock was known for making the morning coffee.  He and others who came to be involved in this scheme worked under Plaintiff Derek Felsman. However, it was a Sergeant's responsibility to monitor shifts and time.

16.    After reviewing this information in SAP, Plaintiff Dougherty called Plaintiff, Lieutenant Derek Felsman and directed him to grab Sergeant Hydock and both come to Plaintiff Dougherty's office.  Sergeant Hydock was asked why he had been scheduled for  1200-2000 shifts and for how long.  His response was to simply shrug his shoulders and say that it didn't go on all year.  Sergeant Hydock was not questioned further as it was clear that this situation could turn into a criminal investigation.

17.    After speaking with Sergeant Hydock, Plaintiff Dougherty again went back into the SAP system to see how long this was occurring.  In doing so, he learned that the two Criminal Investigation Unit Supervisors (Corporals) serving underneath Sergeant Hydock also had the same schedule, Corporal Charles Molecavage and Corporal Jason Rasmus.  The period of time totaled an eight-month period for all three members having been  scheduled 1200-2000 shifts.  Plaintiff Dougherty also observed their schedules would revert back to a 0700-1500 shift when there was overtime involved for a major case activation or other incident requiring shift extension.  Plaintiff

9

Dougherty then examined the Daily and Weekly Rosters that are required to be printed, posted and filed. When Plaintiff Dougherty looked into the file, he saw that no crime rosters had been filed. It was apparent that Sergeant Hydock was not filing them as required; although, he is a 15-year Sergeant who is very well-versed with Pennsylvania's Crimes Code as well as the rules and procedures of the State Police.  Moreover, as a Sergeant he was responsible for supervising the time and scheduling of others Molecavage and Rasmus were similarly well versed with both Pennsylvania's Crime Code and the rules and procedures of the State Police.

18.     The crimes code at Title 18 provides for the felonies of theft by deception (18 Pa. C.S. Section 3922) and theft of services (18 Pa. C.S. Section 3926) . A consideration of the value of the theft based upon the pertinent salary makes for a felony classification. . In addition, this sort of behavior is expressly barred by pertinent PSP rules and regulation

19.     Considering the nature of the crimes apparently committed, Plaintiff Dougherty then spoke to Internal Affairs Division Captain Nicholas Cortes and informed him of his findings; that all three of the members, Sergeant Hydock, Corporal Molecavage, and Corporal Rasmus have the same schedule of 1200-2000 hours; but that they definitely don't simply work straight 1200-2000 hours.  Plaintiffs observed them in the morning hours.

20.     After taking this all into consideration, and again speaking with Lieutenant Felsman, Plaintiffs decided that that the right thing to do was to complete a Blue Team Entry which is defined at AR-25.04 as "A web-based application used for recording complaints against Department personnel…" and have the Internal Affairs Division (IAD) conduct a thorough investigation. To that end, Plaintiffs agreed upon an approach. with Plaintiff Dougherty stating that he would complete the Blue Team entry.

21.    The next day, February 12, 2025, prior to completing the Blue Team entry, Plaintiff Dougherty spoke to Major Norman Cramer, his immediate supervisor, and informed him of the findings and stating that he was going to complete a Blue Team entry.  Major Cramer's response was to pause and say that "this could get legs", attempting to discourage Plaintiff. The inference . was  that the practice was widespread throughout the PSP. Notwithstanding, Plaintiff Dougherty told him that he was adamant about reporting it and it was the right thing to do.  Plaintiff Dougherty felt that he was 100 percent confident that fraud and theft were taking place and that all three individuals are veterans of the force and are very familiar with PSP rules and procedures. Accordingly, Plaintiff Dougherty completed the Blue Team entry on February 13, 2025.

22.    Plaintiffs believed that the right thing to do was the Blue Team entry and an IAD investigation.  Furthermore, given Plaintiffs' conviction that a criminal act took place, Plaintiffs believed that these individuals would be arrested and that a separate criminal process would take place. Ironically, the PSP, itself responsible for adherence to Pennsylvania's Crimes Code, did no such thing.  In fact,  after reporting this incident, Plaintiff Dougherty was continually bullied, threatened and retaliated by his immediate supervisor and threatened with removal.

23.    After entering the Blue Team, it was clearly apparent that Plaintiff Dougherty's immediate supervisor, Major Norman Cramer was dissatisfied with him. Plaintiff Dougherty began to experience a hostile work environment in part consisting of increased scrutiny and unwarranted criticism.  Cramer's conduct towards Plaintiffs was continuously retaliatory in nature, further marginalizing Plaintiff Dougherty within the Department.

24.    On March 3, 2025, Corporal Jason Rasmus, then subject of an IAD investigation, filed a bogus and retaliatory Blue Team entry against Plaintiff Dougherty and Lieutenant James Youngblood, claiming that Plaintiff Dougherty and Lieutenant Youngblood were creating    a

hostile work place and that Plaintiff Dougherty was aware that there was nothing wrong with this schedule because Dougherty did allow a prior Crime Corporal to work a 1200–2000 schedule when Dougherty was a Sergeant, several years earlier.  As proved through an IAD audit, the Corporal that was allowed this schedule did, in fact, actually work the schedule under Dougherty's watch. This was proved thru an IAD audit.

25.  Major Cramer came to Plaintiff Dougherty's office on March 4, 2025, informing him in a hostile tone that Rasmus filed a Blue Team on him and Lieutenant Youngblood, and that "it didn't look good for" Plaintiff Dougherty, instructing him  not to speak to Rasmus. Further, Major Cramer said that he wondered where Lieutenant Colonel Bivens was going to put Dougherty "after this all plays out?"  Plaintiff Dougherty immediately asked him why he would be moved when he did nothing wrong, further informing him that Lieutenant Felsman was now doing the schedule and that after speaking with the other supervisors regarding scheduling matters, that daily/weekly reports were being completed the proper way. Plaintiffs increased the level of oversight with respect to scheduling.

26.  On March 18, 2025, Major Cramer came to the Wilkes-Barre Station and was in his office looking at the daily schedules that were posted in the Communications Room.  After a short while, Plaintiff Dougherty went in the office and sat down with him.  Clearly annoyed, Cramer questioned him about the daily schedules. Plaintiff Dougherty answered his questions. Then Cramer's voice increased in volume loudly criticizing him over the schedules. Cramer again repeated his prior statement about being transferred out by Lieutenant Colonel Bivens with Plaintiff Dougherty's response that there was no basis for transferring him as he did not do anything wrong. Plaintiff Dougherty again reminded  him what those three individuals did by falsifying time was to commit fraud and theft. Moreover Plaintiff Dougherty emphasized  that they

were calculated in hiding and deceiving what they were doing. Cramer continued to be loud and hostile   Despite being told that Plaintiff Dougherty did nothing wrong in reporting wrongdoing, Defendant Cramer again repeated the phrase, "We'll see how it plays out for you." Cramer's yelling at Plaintiff Dougherty was overheard by Lieutenant Adam Kowalczyk, Lieutenant James Youngblood, Sergeant John Richards, Trooper William Evans, Clerk Typist Janine Spagnola, Clerk Typist Chrissy Brewer, and Clerk Typist Chloe Sanchez.   After this encounter, the hostility and bullying continued and there were several more times when Cramer taunted Plaintiff Dougherty about where he would be placed.   This hostility was also observed by Troop Administrative Manager (TAM) Holly Yates, who even informed Plaintiff Dougherty that she believed it was clear that Cramer was after him, with the intimidation and bullying ramping up after he reported the theft creating a hostile environment every time he showed up.   This came to include Cramer's insistence that Plaintiff Dougherty shouldn't be speaking with his friend Lieutenant Colonel Christopher King.   From the time that Plaintiffs made a bona fide complaint of criminal behavior   Defendant Cramer created a hostile environment for Plaintiffs by intimidating and bullying Plaintiffs.

27.    Plaintiff Dougherty was subsequently informed by Ms. Yates that Major Cramer returned to PSP offices in Wilkes-Barre and that he was deliberately delayed Plaintiff Dougherty's Members Performance Evaluation (MPE), wanting to learn what would happen to him. TAM Yates also observed Major Cramer pounding on Dougherty's locked office door when he wasn't there.  When she heard the banging, she went out of her office to see what was going on.  Major Cramer immediately asked her in an aggressive manner, "Where is he?"  She informed him that Dougherty was visiting the Towanda Station.  A 40-year veteran employee who worked under

numerous Captains, Ms. Yates told Plaintiff Dougherty that she could not believe the hostile and repeated mistreatment that Major Cramer directed towards him.

28.     Then,  on April 24, 2025, Plaintiff Dougherty sent Plaintiff Felsman, as the Troop Designee, to a law enforcement roundtable at the Luzerne County Courthouse, that included law enforcement leaders and elected officials. Cramer yelled at Plaintiff Dougherty for sending him, saying that Felsman was not a good reflection of the Troop, adding that Plaintiff Felsman could no longer serve as the Acting Troop Commander. .

29.     Plaintiff Felsman personally encountered Major Cramer during  Cramer's  May 19, 2025 visit, as Felsman was preparing to head to a community service award event. After informing Cramer that he had to depart,  Cramer proceeded to berate him about the ongoing IAD investigation against the three officers, telling him that the only reason that Plaintiffs were not themselves subject to an IAD investigation was because of Lieutenant Colonel King.  He then proceeded to loudly and aggressively question his management of a cold case that the Troop had been working on, which was hampered by Major Cramer who himself assigned two PSP personnel who lacked Crime Sergeant or Crime Lieutenant experience. He also told Plaintiff Felsman that the Bureau of Criminal Investigation Major did not like him. Furthermore, Cramer suggested that Felsman take a lateral move. He would say such things as "I think that people are jealous of you making Lieutenant at 14 years"  and that  "some people want you to fail'.  Plaintiff Felsman  defended himself, advised him that he had served his entire supervisory career in challenging Troop operational positions.   What amounted to a 90-minute screaming session was overheard by multiple civilian staff, prompting  Ms. Yates to ask Plaintiff Felsman whether he was ok, and commenting  that she had never seen anyone treated as badly as Plaintiffs.  The end result was that

Plaintiff Felsman was not able to receive the community service award and missed the entire event as he was forced to endure Cramer's long harangue.

30.    On May 20, 2025, Republican Congressman Robert Bresnahan shared photos on social media of Plaintiff Felsman's May 13, 2025 visit with him in Washington D.C., during National Police Week where the two of them discussed  Felsman's two close friends who were shot and killed in the line of duty.  Plaintiff Felsman had taken leave to attend the once-a-year solemn event.  After his visit, Plaintiff Felsman was informed by Plaintiff Dougherty that Cramer was not happy Plaintiff Felsman was there.  He questioned Felsman's management of the Criminal Investigation Unit and criticized the fact that he enjoyed community engagement.  It was later reported to Plaintiff Felsman that Cramer was overheard lamenting that Felsman met with his Congressman and further told Plaintiff Dougherty, "He better not be wearing the uniform." Presumably this and the criticism over the Trump photo arose from the Democrat front office, reflective of Democrat Governor Shapiro's  partisan party leanings.

31.    On May 29, 2025, while Plaintiff Dougherty was driving to Wyalusing High School for the graduation of the daughter of a fallen trooper, PSTA (union) President Steve Polishan, called  and  informed him that he was now a subject in an  investigation. At the graduation, Plaintiff Dougherty informed Major Cramer of being a subject; although, it was clear that Cramer had already known thus.   His first comment was a familiar refrain: "When they move you, I wonder where it will be.  Probably the casino because there is no Captain there."   Again, Plaintiff Dougherty insisted that this was about three individuals who had  committed theft and fraud and that this investigation of him was clearly retaliatory .It was clear then and there to Plaintiff Dougherty that this was virtually unprecedented and that he would  never progress to the rank of Major.

32.    On June 6, 2025, Plaintiff Dougherty received a copy of the Disciplinary Action Report from Adjudicating Officer, Captain Jeremy Barni.  The allegation against him was Improper Supervision of Troop P members who, in fact, were not directly under his direct supervision.

33.    This finding placed Plaintiff Dougherty in a false light.  When it came to Troop P, he was a very popular and hard-working Captain who built strong bonds with the community, local police chiefs, state and local politicians, and most importantly with his Troopers. Other than the three supervisors who were committing fraud and theft, the Troop ran very well with minimal problems. All of his Member Performance Evaluations were always very good

34.    On June 25, 2025 Troop P Criminal Investigation Unit received the Pennsylvania State Police Commissioner's Significant Achievement Award for a complex multi-state and multi-agency Drug Delivery Resulting in Death Investigation that Plaintiff Felsman managed in 2024. While it was customary that the Criminal Investigation Section Commander (Crime Lieutenant) be included in the award because of his direct involvement  managing these types of investigations, Plaintiff Felsman's  exclusion  from this award was a notable exception.

35.    A decision came down on July 2, 2025 by the Department with respect to the three accused of theft. The main culprit, Sergeant Hydock received a 25-day suspension and was transferred to a specialty position inside the same building where he was previously stationed. Sergeant Hydock was not demoted or transferred to another location.  He was moved to a newly-created position with limited responsibility.  He was put in charge of coordinating the station's "Trunk or Treats".  Although the fraud/theft committed reached  the threshold for a felony theft by deception and theft of services pursuant to the Crime Code, the PSP never chose to  arrest or criminally charge him or the others.  As far as the other two were concerned, Corporal Rasmus

and Corporal Molecavage both admitted to being paid for a shift differential they were not entitled to. Corporal Molecavage admitted to manipulating the schedule to hide Sergeant Hydock's shift differential theft. Notwithstanding, Molecavage subsequently received an honorable discharge. Ironically, Corporal Molecavage previously served in the Bureau of Integrity and Professional Standards as part of the Systems and Process Review Division. Presumably this enabled him to be well-versed in Department regulations when it came to manipulating and hiding Hydock's schedule. Additionally, Corporal Rasmus was not removed from the Criminal Investigation Unit.

36.    Also on July 2, 2025, Plaintiff Dougherty had to report to Lieutenant Colonel Bivens' office at headquarters. Major Cramer was also present when Plaintiff Dougherty was told that he was being transferred immediately to the Municipal Police Officers Education and Training Commission in Harrisburg. Plaintiff Dougherty was told that this was separate from the disciplinary process. Further, Lieutenant Colonel Bivens told him that "We want change in Troop P and we can't move any of the Lieutenants so we are moving you." Since Plaintiff Dougherty's removal was immediate, , he wasn't even provided the decency to address his Troop. To embarrass him further, Plaintiff Dougherty was provided with an outdated Department pool vehicle, distinct from those customarily issued to other individuals of Plaintiff Dougherty's rank, signaling to others a loss of status and professional standing. Plaintiff Dougherty was not given appropriate office space, temporarily assigning him to work from a conference room, thereby reinforcing the perception that he had been sidelined or punished.

37.    Also, on July 2, 2025, Plaintiff Dougherty called Plaintiff Felsman, alerting him that "Norm is coming for you next." This was despite the fact that there was no pending or current IAD investigation filed against Plaintiff Felsman.

38.    On July 3, 2025 a new Captain was promoted to Troop P.  Furthermore, a Lieutenant was promoted and also assigned to Troop P. It is noteworthy that  is was done without the regulation-required  transfer window for any current Lieutenants before the promotion of anyone new to this rank. This brought four to the number of Lieutenants to Troop P,  despite the fact that  only three positions were allowed per established manpower allocations.

39.    On July 8, 2025, Major Cramer removed Plaintiff Felsman from his position as Criminal Investigation Section Commander, without providing any reason and assigned him to the newly created position of Special Projects Section Commander; a made-up broom closet position. This position did not exist anywhere else in the Commonwealth of Pennsylvania and no workload or manpower allocation justified the creation of the position.  With his replacement then present, Plaintiff Felsman was told to move his office immediately to a vacant office across the hall from the Troop clerical staff.  In his 18 years, Plaintiff had never seen a Lieutenant promoted without the transfer window open for current Lieutenants. Plaintiff experienced a decrease in pay and loss of earnings as well as the elimination of any opportunity for future promotion and future retirement prospects. Upon information and belief, Major Cramer was overheard saying that he was proud to have blindsided Plaintiff Felsman.   This was embarrassing and painful, resulting in the loss of sleep and stress, culminating in an emotional breakdown in front of his two youngest children.

40.    On 07/17/25, Plaintiff Felsman observed his name on a back page of the Troop P roster.  He asked the clerical staff why he wasn't positioned on the front page with the other three Lieutenants.  TAM Yates and Clerk Typist Sanchez confided in Plaintiff Felsman that on the day of his removal from Crime, they edited the Troop roster and placed him underneath the other three Lieutenants as the Special Projects Section Commander.  They submitted the Troop roster to Lieutenant Colonel Bivens' secretary, Diana Bates, as was customary, through Microsoft Teams.

TAM Yates advised Plaintiff Felsman that Diana Bates called her and advised her specifically to move him to a back page somewhere and not where he should appear on the first page with the other Troop Command staff. TAM Yates directed Clerk Typist Sanchez to do what Diana Bates requested. Plaintiff Felsman took this as a form of continued embarrassment, discipline and retaliation against him which had to have been specifically ordered by Defendant Bivens.

41.    Plaintiff subsequently came to feel that he was being coerced into transferring . He was fearful of continued retaliation and further discipline if he remained. Accordingly, Plaintiff Felsman made the transfer. After Defendant Cramer removed him , the next line out of his mouth was, "There may be more movement in the near future." Then, approximately three hours after his removal from Crime, the transfer window opened via email for current Lieutenants. Not knowing if there would be an open Lieutenant position in Troop R, Plaintiff Felsman asked the new Troop P Commanding Officer, Captain Jim Donnini about potentially transferring to nearby Troop N, Hazleton and was told that he "should only put in for R" and that he "would spoil the apple cart and not be welcomed there." He put in for the transfer to Troop R, which took place, without the filling of his vacancy from the Special Projects Section Commander position.

42.    On July 10, 2025, Plaintiff Dougherty received a Written Reprimand from Major Chris Jones from the Department Disciplinary Office stemming from the IAD filed against him. At the same time, Plaintiff Felsman was not subject to an IAD and received nothing in the way of a reprimand. Plaintiff Dougherty immediately filed a grievance through his Collective Bargaining Unit to contest the Written Reprimand. On August 4, 2025, that Written Reprimand communicated via Notice of Disciplinary Penalty (NDP) issued to Plaintiff Dougherty was rescinded, and both the NDP and the Disciplinary Action Report (DAR) issued in the matter were vacated, indicating no wrongdoing. Nonetheless, Plaintiff Dougherty was informed his transfer would stand.

43.    Having made a bona fide complaint of shift theft, Plaintiffs believe that they have been deliberately targeted and retaliated against by a State Police Agency desirous of covering up what may well be a very widespread theft. As a result of their whistleblowing, advocating compliance with applicable law, Plaintiffs have suffered and continues to suffer targeted harassment orchestrated by Defendants Major Cramer and Lieutenant Colonel Bivens all to their personal and professional detriment.  Incredibly, at a law enforcement agency of all places,  these Defendants  were upset that Plaintiffs complained about and  reported what they recognized as criminal behavior; that the 12-8 shift differential collection was happening despite the fact that individuals involved never worked the shift.  In point of fact, Plaintiff Felsman feels that the his singular retaliation goes back to President Trump's photograph that included him  with others who were not retaliated against ,which Trump circulated on the internet. Absent Governor Wolf's intervention, Plaintiff Dougherty would have been retaliated against with respect to a photo that did not involve him.

### PSP VIOLATION OF APPLICABLE REGULATIONS AND PLAINTIFS' COMPLIANCE THEREWITH

44.    AR 4-6 (8/28/2020 ) sets forth RULES OF CONDUCT FOR EMPLOYEES beginning with a statement of PURPOSE  that " It is the policy of the Department that the treatment of, and interaction with, individuals, both within and outside the Department, be held in the highest regard. " When it comes to 6.02, "SCOPE" in part provides that "Therefore, each employee, as a representative of the Department and State government has an obligation to adhere to high standards of honesty, integrity, and impartiality in their personal conduct." Further, Section 6.03 A.  provides for "Deportment" where "Employees shall conduct themselves at all times in such a manner as to reflect  most favorably on the Department and the Commonwealth, thereby promoting good public relations. Undesirable conduct shall include

immorality or any act or conduct not specifically mentioned in these rules which tends to bring the Department and/or Commonwealth into disrepute or reflects discredit upon the individual employee. " Clearly the theft of shift time and the attendant cover-up whereby the offender makes more money , falsely claiming to have worked time that he did not work and where their superiors facilitate such fraud,  constitutes a basic violation of the Regulations as well as Pennsylvania's criminal law.

45.     Plaintiffs fully complied with FR1-1  (8/2/2021)   GENERAL REQUIREMENTS in reporting "UNBECOMING CONDUCT"  which is defined at 1.02 as  "conduct which could reasonably be expected to destroy public respect for Pennsylvania State Police officers and/or confidence in the Department . Members shall not conduct themselves in a manner which is unbecoming to a police officer. "   Further, Plaintiffs were acting in "CONFORMANCE TO LAWS", Section 1.03 A.  that  "Members shall conform to and abide by the laws of … the Commonwealth of Pennsylvania in reporting theft"  while Defendants did not meet the requirements of 1.03 C. that "Violating of any law by a member shall be critically reviewed by the Department to determine the appropriate level of discipline….."

46.     Plaintiffs fully complied with FR 1-1, Section 1.18  entitled "REPORTING OF INFORMATION " B. that "Members shall promptly report to their supervisor any information which comes to their attention and which tends to indicate that any other member or employee has violated any law, rule regulation, or order."  In this case Plaintiffs made a bona fide report of violation of the Crimes Code as well as PSP regulation.

47.     FR 1-1, Section 1.21 prohibits members with "INTERFERENCE WITH DISCIPLINE" Upon information and belief there was interference with the participants in the

disciplinary process when it came to the three members whom Plaintiffs reported. Also the

process was violated when to the retaliatory disciplining and reassignment of Plaintiffs.

48.     FR 1-2  (11/5/2021) sets forth duty requirements for PSP members explicitly

stating at 2.02 that:

> Members shall conscientiously strive to enforce the laws of the Commonwealth and
> render service to all citizens and visitors within the Commonwealth. Members shall also
> be held responsible for the proper performance of all duties assigned to them; the
> appropriate use of delegated authority and strict adherence to the rules, regulations m and
> directives promulgated by the Department. Ignorance of the rules, regulations and
> directives shall not be considered an excuse or justification for any violation of such by a
> member.

Further, Section  2.10 provides for "DUTY REQUIREMENTS" specifically stating at Section A.

that "Members shall report for duty at the time and place specified by their supervisor." In

addition, Section 2.18 "REPORTS" provides that " Members shall submit all necessary reports

on time and in accordance with existing regulations. Reports shall be truthful, and no member

shall knowingly enter or cause to be entered any inaccurate, false, or improper information or

date, misrepresent the facts in any record or report." Additionally, Section 2.32 bars knowingly

providing false information with respect to their duties.  Section 2.33 states that

"Commanders/supervisors bear a particular responsibility  as it relates to the conduct of

subordinate personnel. If a Commander/supervisor has knowledge of misconduct on the part of

subordinate personnel and  fails to act, that Commander/supervisor shall be held accountable

Nothing herein shall be construed to absolve personnel of their responsibility for acts of

misconduct they may commit."

49.     FR 5-2 is entitled "PREMIUM PAY AND PREMIUM TIME REPORTING" and

is something that all members of the PSP are charged with knowing and abiding by Section

2.02A which states as follows: "A. Premium Time: Premium time may result from ….shift

differential, and other non-overtime special situations required by labor agreements. Furthermore, Section 2.02 B requires authorization and approval. Moreover, Section E provides specifically that '"Personnel who are assigned to work an evening or night shift shall be eligible for shift differential….."

50.     Finally, AR-25 (3/12/2019) is entitled "INTERNAL INVESTIGATIONS" . Section 25.03 B provides in pertinent part for "Protection of the Department: The integrity of the Department depends on the personal integrity and self-discipline of all personnel. Public support and confidence is earned through a fair and impartial process of investigating and adjudicating allegations of misconduct.  Pertinent definitions found at 25.04 include  "K. IA Investigation: An indepth and impartial fact finding process , …  " and "O. Misconduct: A violation of the Pennsylvania State Police (PSP) Code of Conduct, Governor's Code of Conduct, or any other conduct which could reasonably be expected to destroy public respect and confidence in the PSP."  The Governor's Code of Conduct similarly bars "disgraceful conduct or any other behavior , on or off duty, which may bring the service of the Commonwealth into disrepute".

51.     A review of applicable regulations shows that Plaintiffs made their bona fide complaints against the three individuals after finding from applicable records that  they received shift differential pay for shifts that were not in fact worked and that records were actively concealed.  The IAD(s) which followed did not meet the standards set forth for such proceedings either for the three individuals Plaintiffs reported or for Plaintiffs when it came to the retaliatory IAD against Plaintiff Dougherty.

52.     A review of the proceedings brought against Plaintiff Dougherty showed them to be violative of the standards set forth for such proceeding, including standards set forth for Discipline under the applicable Collective Bargaining Agreement. Moreover, it was necessary

for Plaintiff Doughtery to file and proceed with grievance proceedings to have the IAD results

vacated. Now, Plaintiff Felsman has filed a grievance for having been retaliated against in the

terms and conditions of his employment despite there never was an IAD against him. Moreover ,

he and Plaintiff Dougherty were retaliated against without regard for the Disciplinary Provisions

of the Collective Bargaining Agreement .

53.    Moreover, APPENDIX E to the Collective Bargaining provides a textbook

example of what did not transpire when it came to those who were "investigated", but never

legally prosecuted under the Crimes Code, as they should have been, like any other

Pennsylvanians outside of the PSP.

> APPENDIX E Members of the Pennsylvania State Police must be morally and ethically above reproach at all times regardless of duty status. All members shall respect the sanctity of the law and shall be committed to holding themselves to the highest standard of accountability. No member shall depart from standards of professional conduct or disobey the law. Members should be subject to disciplinary action only for "just cause."….. Certain conduct immediately and absolutely threatens the integrity of the Department's public duty and responsibility. In the following circumstances, the proper level of discipline is termination of employment, notwithstanding any mitigating circumstances. Such conduct includes, but is not limited to, the following: [1] Engaging in any action that constitutes the commission of a felony or a misdemeanor which carries a potential sentence of more than one (1) year, or in any action that constitutes the commission of an equivalent offense in another jurisdiction, state, or territory. ….[5] The commission of a serious act of deception during a criminal, civil or administrative investigation or proceeding, when under a specific, official obligation to be truthful, involving intentional (1) lying; (2) fabrication; (3) misleading acts or words; (4) civil or criminal fraud; or (5) perjury. Notwithstanding anything to the contrary in this Agreement, no member may be subject to disciplinary charges for violating this subsection in regard to a statement or statements the member made in a Departmental disciplinary investigation involving another member before the allegations involving the underlying investigation of that other member have been either dismissed by the Department or sustained or dismissed by an arbitrator as provided herein. ] [6])Any activity that constitutes an intentional violation of Chapter 39 of the Crimes Code (relating to Theft and Related Offenses)….

## COUNT I

**VIOLATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION and THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. SEC. 1983**
**Violation of First Amendment Freedom of Speech & Association, Due Process Equal Protection and**
**Retaliation Thereunder**

**Patrick J. Dougherty and Derek D. Felsman v. Governor Josh Shapiro in his Official Capacity Prospectively, Major Norman Cramer in his individual capacity, Lieutenant Colonel George Bivens in his individual capacity and John and Jane Does #1-#10.**

54..    Plaintiffs  restate and reallege paragraphs 1 through 53 as though set forth here in full.

55.    The above named individual defendants, with the possible exception of Governor Josh Shapiro who lacked the requirement of oversight of his own administration,  have discriminated against the Plaintiffs  by depriving them of their  rights, privileges and immunities secured by the Constitution and laws of the United States as applied to the States pursuant to the Fourteenth Amendment. by retaliating against them , placing  them  jobs with inferior responsibilities and lower prospects of advancement  as a result of  his lawfully complaining about theft.   Repeatedly those defendants named in their individual capacities,  have, abridged Plaintiffs Due Process and First Amendment rights to free speech and association given their bona fide reporting of the theft of services, theft by deception pursuant to the Pennsylvania Crimes Code, pursuant to applicable PSP regulations and the Governor's Code of Conduct. Defendants' conduct has been retaliatory, intentional, deliberate, willful, and conducted in callous disregard of Plaintiff's rights and applicable law.

56.    Plaintiffs have been subject to discipline without being afforded due process . The CBA provides that members should be subject to disciplinary action only for "just cause". Accordingly Plaintiffs  have a property interest in their public employment. As set forth herein, Plaintiffs were unilaterally removed from prior positions and placed in inferior assignments with less prospects for promotion or advancement, constituting  discipline without notice and an opportunity to be heard beforehand  .

57.    By making bona fide reports of theft , the retaliation against Plaintiffs resulted in their receiving different treatment from that received by other similarly situated individuals.. Plaintiffs were treated differently because of their exercise of their fundamental rights of free

speech in such reports. Accordingly, their rights to equal protection under the Constitution have been violated.

58.    Given the need for prospective relief from a party in a position to stop his administration's further violation of PSP Regulations and the Governor's Code of Conduct, the Pennsylvania Whistleblower Law and Plaintiffs' constitutional rights under the Section 1983, Governor Josh Shapiro is named in his official capacity with a request that this Court enjoin his administration from further ongoing violations of law and retaliation against Plaintiffs. He is sued in this matter expressly based on the Supreme Court's ruling in *Ex Parte Young*, 209 U.S. 123 (1908)

59.    To establish a claim for First Amendment retaliation, a Plaintiff must show: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.". *Thomas v. Independence Twp.,* 463 F.3d 285. 296 (3d/ Cir 2006) (further citation omitted).

60.    Plaintiffs has been repeatedly demoted into inferior positions  without any semblance of equal protection or  due process.

61.    Plaintiffs has engaged in constitutionally protected activities and should have received due process. Simply stated, defendants named have failed to afford Plaintiffs due process and have retaliated against them for both engaging in protected speech and related protected activities in attempting to uphold the law, at a law enforcement agency of all places.

62.    As a direct and proximate result of this retaliatory action, Plaintiffs have repeatedly been falsely stigmatized as having done something wrong,  have suffered and will

continue to suffer embarrassment, humiliation, financial harm, emotional and psychological harm, and pain and suffering, some or all of which may be permanent.

63.     As a direct and proximate result of this retaliatory action, Plaintiffs haves incurred attorneys' fees and other costs.

64.     By reason of Defendants' actions, Plaintiffs are entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiffs demand judgment in their favor and against the named individual defendants and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper. As per the prospective relief to be accorded Plaintiffs against Defendant Governor Josh Shapiro, Plaintiffs requests that as the chief officer of the Executive Branch that be enjoined from continuing his administration's from violating the laws referenced hereinabove.

## COUNT II

### VIOLATION OF PENNSYLVANIA WHISTLEBLOWER LAW
43 P.S. § 1421, *et seq*

**Patrick J. Dougherty and Derek D. Felsman vs. Defendant Commonwealth of Pennsylvania**

65.     Plaintiffs restate and reallege paragraphs 1 through 64 as though set forth here in full.

66.     Pennsylvania law provides Plaintiff with relief pursuant to the Pennsylvania Whistleblower Law, 43 P.S. § 1421, *et seq.* ("Whistleblower Law").

67.    The Commonwealth of Pennsylvania  is subject to the Pennsylvania Whistleblower Law as Plaintiffs' "Employer" directly paying them as such .

68.    By making written and verbal good faith reports of waste and wrongdoing as set forth hereinabove, Plaintiffs come within the definition of a whistleblower under this law as "a person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority."

69.    As set forth hereinabove, Plaintiffs fit within the protected class of employees under the Whistleblower Law, as they were retaliated against as a result of engaging in protected conduct.  Specifically, §1423(a) thereof provides that "No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employer's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste."

70.    By reason of the Defendant Commonwealth's actions exercised by the named Defendants and others, Plaintiffs are  entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiffs demand a trial by jury and judgment in their favor and against Defendant Commonwealth of Pennsylvania and request an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

**MARK D. SCHWARTZ, ESQUIRE**

By:  /s/ Mark D. Schwartz
    Mark D. Schwartz, Esquire (Pa ID #30527)
    P.O. BOX 330
    BRYN MAWR, PA 19010
    Telephone & Fax 610 525-5534
    Markschwartz6814@gmail.com


    Attorney for Plaintiffs Pat Dougherty
    and Derek Felsman

DATE: November 28, 2025